**[J-49A-2020 and J-49B-2020] [MO: Mundy, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | |
|---|---|
| UNIONTOWN NEWSPAPERS, INC., D/B/A THE HERALD STANDARD; AND CHRISTINE HAINES, | : No. 76 MAP 2019 |
| | : |
| | : Appeal from the Order of the |
| | : Commonwealth Court at No. 66 MD |
| Appellees | : 2015 dated March 23, 2018. |
| | : |
| | : ARGUED:  May 21, 2020 |
| v. | : |
| | : |
| | : |
| | : |
| PENNSYLVANIA DEPARTMENT OF CORRECTIONS, | : |
| | : |
| | : |
| Appellant | : |
| | |
| UNIONTOWN NEWSPAPERS, INC., D/B/A THE HERALD STANDARD; AND CHRISTINE HAINES, | : No. 77 MAP 2019 |
| | : |
| | : Appeal from the Order of the |
| | : Commonwealth Court at No. 66 MD |
| Appellees | : 2015 dated October 29, 2018. |
| | : |
| | : ARGUED:  May 21, 2020 |
| v. | : |
| | : |
| | : |
| | : |
| PENNSYLVANIA DEPARTMENT OF CORRECTIONS, | : |
| | : |
| | : |
| Appellant | : |

**DISSENTING OPINION**


**JUSTICE DOUGHERTY**                    **DECIDED:  December 22, 2020**

In my view, the record does not support the determination that appellant,

Department of Corrections (DOC), acted in bad faith in replying to requests for documents

by appellees, reporter Christine Haines and The Herald Standard. Accordingly, I respectfully dissent.

The record shows the email request by appellees was "inspired by" a report issued by the Abolitionist Law Center entitled, "No Escape: Exposure to Toxic Coal Waste at State Correctional Institution Fayette" (the report). *Uniontown Newspapers, Inc. v. Pa. Dep't of Corr.*, 151 A.3d 1196, 1200 (Pa. Cmwlth. 2016) (*Uniontown I*). The report described, *inter alia*, SCI-Fayette inmates' complaints of cancer, pulmonary, and gastrointestinal disease, and linked the complaints to the penitentiary's geographical proximity to a fly-ash dump site. Haines's request for documents, dated several weeks after the report's publication, was vague. It did not mention the report or expressly seek documentation relating to the claims in the report. Rather, it sought documentation of "illnesses" generally, the numbers of persons with "those illnesses," and expressed "particular" interest in "various types of cancer" and "respiratory ailments" reported at SCI-Fayette.[1]

At the time DOC received the request, it was jointly involved in an investigation regarding the report with the Department of Health (DOH). DOC's Open Records Officer (ORO), Andrew Filkosky, to whom the records request was addressed, relayed the request to DOC's Health Care Bureau, which advised him the requested records related to the investigation. Accordingly, DOC denied the request in partial reliance on the non-criminal investigation exception contained in Section 708(b)(17) of the Right to Know Law

---

[1] The email request stated: "I am seeking documentation of illnesses contracted by inmates and/or staff members at SCI-Fayette. I am not seeking identifying information, only the types of reported contracted illnesses and the number of inmates or staff members with those illnesses. I am particularly interested in various types of cancer reported at SCI-Fayette since its opening, as well as respiratory ailments reported. If there is also information comparing the health at SCI-Fayette with the health at other state correctional facilities, that would be helpful." RTKL Request, 9/25/14; *Uniontown I*, 151 A.3d at 1200.

(RTKL). *See* 65. P.S. §67.708(b)(17) (excepting "[a] record of an agency relating to a noncriminal investigation").

Appellees appealed the denial to the Office of Open Records (OOR) which determined the non-criminal investigation exception did not apply. DOC did not appeal from the OOR order; instead, DOC timely turned over fifteen pages of charts and data, which identified the number of inmates treated for various forms of illness, showing rates of cancer, pulmonary and gastrointestinal disease at SCI-Fayette from 2010-2014, including a comparison across institutions, comparisons of deaths from natural causes to cancer deaths, and a spreadsheet of cancer deaths by type of cancer from 2003-2013. In response to the appellees' request to verify DOC's disclosure was complete, DOC additionally disclosed a press release, a water analysis of SCI-Fayette, an investigative summary by a physician, a redacted medical records review by a physician, a redacted list of cancer patients at SCI-Fayette, statistics regarding oncology treatments and internal emails discussing the investigation. DOC also averred it had no data comparing overall SCI-Fayette illness rates with other SCIs, and it did not maintain health records of its staff.

Importantly, in my view, in a later fact-finding stage pertaining to appellees' petition for sanctions, the Commonwealth Court determined DOC's initial "construction" of the request as pertaining to documents related to the investigation "alone does **not** evince bad faith." *Uniontown Newspapers v. Pa. Dep't of Corr.*, 185 A.3d 1161, 1171 (Pa. Cmwlth. 2018) (*Uniontown II*) (emphasis added). The court instead determined the problem was "that DOC did not give any specific, **separate** consideration to the [r]equest at all." *Id.* (emphasis in original). However, the record clearly shows, when OOR informed DOC that the non-criminal investigation exception did not apply, DOC searched its records and timely disclosed the documents described above. Indeed, the

Commonwealth Court, despite determining there was no "separate consideration to the [r]equest at all," described DOC's request-responsive disclosure as consisting of "charts depicting the following: the number of patients with pulmonary conditions in all SCIs (from Chronic Care Clinic records); the number of inmates with cancer in all SCIs (2010-13); inmate cancer deaths by institution (2010-13); inmate cancer deaths at SCI-Fayette (2003-13); the number of inmates treated by Pharmacy Contractor for pulmonary ailments (2010-14); and the number of inmates treated by Pharmacy Contractor for gastrointestinal ailments (2010-14)." *Id.* at 1165. The court also noted that, when asked to verify the completeness of its disclosure, the DOC advised appellees additional review was necessary to "see if other records existed that were responsive[,]" *id.* at 1165, and thereafter disclosed memos and emails from physicians involved in the investigation, as well as "cancer patient tracking charts from the Oncology Database for DOC as of November 2014, and for SCI-Fayette as of January 2015." *Id.* at 1166.

In light of these circumstances, the single-judge Commonwealth Court's determination DOC acted in bad faith is incongruous. The original request was arguably ambiguous, as it sought documents regarding "illnesses contracted by inmates" generally, with a "particular[ ] interest[ ]" in "various types of cancer" and "respiratory ailments reported." And, not surprisingly, the court held DOC did **not** act in bad faith by presuming the request related to documents pertaining to the investigation. But, after DOC was informed the Section 708(b)(17) exception did not apply, and in the face of DOC's subsequent disclosure of the documents responsive to the request, the court nevertheless determined DOC acted in bad faith by giving the request no "separate" consideration. *Uniontown II*, 185 A.3d at 1171. The learned majority observes the court "by implication" faulted Mr. Filkosky "for his slavish reliance on the Health Care Bureau's conclusion that the only responsive records related to the . . . [i]nvestigation." Majority

Op. at 14. But from my perspective, after DOC was informed the non-criminal investigation exception did not apply, it **did** conduct a search, which resulted in its disclosure of numerous responsive documents.

Moreover, if there were other "responsive records" that fell outside the oblique initial request for "illnesses" generally, perhaps unrelated to the investigation, any responsive "search" for them would indeed be burdensome, as the request was so ill-defined that the DOC's Health Care Bureau and ORO would have little idea regarding what records precisely were being sought and would satisfy the request. Thus, it seems to me, when informed the non-criminal investigation exception was inapplicable, DOC disclosed the data pertaining to the imprecise request as fully as it reasonably could. There appears to be no dispute the documents disclosed at that time were responsive to the request, but it appears the court nevertheless determined there was bad faith in failing to disclose additional documents. Even beginning, as we must, from a presumption of transparency when resolving disputes regarding the disclosure of government records under the RTKL, *see ACLU of Pa. v. Pa. State Police*, 232 A.3d 654, 656 (Pa. 2020), I view the documents DOC disclosed as responsive enough to overcome a claim of bad faith, given the nature and timing of the request, and the salience of the documents actually produced.

I also note that before the OOR, DOC asserted it possessed records it deemed exempt based on the advice of counsel, who "[c]ritically," submitted a verification to the OOR, "without ever obtaining or reviewing the records." Majority Op. at 6, *citing Uniontown II*, 185 A.3d at 1173. On that basis, the Commonwealth Court concluded "'by contesting access during the appeal, without obtaining all records and assessing the records' public nature, DOC acted in bad faith." *Id.*, *quoting Uniontown II,* 185 A.3d at 1173. I question whether a party's reliance on counsel's advice in an adversarial

proceeding under the RTKL may be seen as acting in bad faith even under the RTKL's somewhat lenient bad faith standard designed to root out governmental lack of transparency.[2]  Given the indefinite nature of the request for documents, I respectfully disagree DOC's search was lacking in the detail necessary to show bad faith under the applicable standard.

---

[2] I agree with the majority's observation that the RTKL is remedial legislation designed to facilitate transparency and as such, proof of bad faith under the RTKL does not require establishing fraud or corruption.  *See* Majority Op. at 9, *citing Uniontown II*, 185 A.3d at 1170 (*citing Bowling v. Office of Open Records*, 990 A.2d 813, 824 (Pa. Cmwlth. 2010)). Rather, a finding of bad faith can be supported by the showing of an abnegation of mandatory duties by an agency, including performance of a detailed search and review to ascertain if the requested material exists or if any exclusions apply, prior to denial of the request.  *Id.*